**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Helen M. JACKSON, Necole E. Lamb,
Donald E. Lamb, and Ruby Lamb,
Defendants–Appellants.**

Nos. 94–2117, 94–2206, 94–
2238 and 94–2371.

United States Court of Appeals,
Seventh Circuit.

Argued May 30, 1995.

Decided Sept. 11, 1995.

David H. Miller, Asst. U.S. Atty. (argued), Fort Wayne, IN, for U.S.

Lawrence Wolf Levin (argued), Chicago, IL, for Helen M. Jackson.

Nikos Christos Nakos (argued), Fort Wayne, IN, for Necole E. Lamb.

Frank J. Gray (argued), Beckman, Lawson, Sandler, Snyder & Federoff, Fort Wayne, IN, for Donald E. Lamb.

Joan M. Kripke (argued), Chicago, IL, for Ruby Lamb.

Before CUMMINGS, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Today we examine a family drug conspiracy involving the parents, one child, and an aunt. All were convicted and have commenced serving long sentences. The family members appeal their convictions and sentences.

## I. Background

Ruby Lamb and Donald Lamb were formerly married to each other but resided separately at the time relevant to this case. Ruby Lamb lived in a house she owned in Fort Wayne, Indiana. One of her daughters, Necole Lamb, lived elsewhere in Fort Wayne. Helen Jackson, Ruby Lamb's sister and Necole Lamb's aunt, lived at yet another Fort Wayne location.

Federal authorities suspected, because informants told them so, that the Lambs and Helen Jackson trafficked in drugs. To get more evidence, FBI agent John McGauley obtained a court order pursuant to 18 U.S.C. § 2518 for a wiretap on three phone lines, including the line in Ruby Lamb's house. During thirty days of constant monitoring, the FBI recorded scores of conversations among the four defendants.

Based on information garnered from the wiretap, federal agents obtained a warrant to search the residences of Ruby Lamb and Helen Jackson. At Ruby Lamb's house, agents found pieces of a paper trail recording drug transactions, such as price lists and a ledger recording drug distributions made by members of the conspiracy. Agents also found a triple-beam scale (used for precise weighing of small quantities of drugs) and plastic baggies of the sort used to package drugs for retail sale. At Helen Jackson's house, agents found 127 grams of cocaine packaged in eighteen individual plastic bags, all wrapped in a towel underneath the pillow on the left side of Helen Jackson's bed. They also found about 25 grams of marijuana. In Jackson's bedroom they found two guns: a loaded Taurus .357 Magnum revolver under the pillow on the right side of the bed and a Smith & Wesson .357 Magnum underneath the bed. They also found more records of drug transactions.

The government indicted all four defendants on a battery of drug-related charges. A jury convicted all four defendants of conspiracy to distribute cocaine, 21 U.S.C. § 846, as well as using a firearm in relation to that conspiracy, 18 U.S.C. § 924(c). The jury additionally convicted Helen Jackson of making her residence available for unlawfully storing, using, manufacturing or distributing controlled substances, 21 U.S.C. § 856(a)(1), of possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1), plus using a firearm in relation to the possession offense. Finally, the jury convicted Donald, Ruby, and Necole Lamb of using a communications facility (a telephone) in furtherance of a conspiracy to distribute drugs. 21 U.S.C. § 843(b).

The district court sentenced Helen Jackson to 378 months (78 months plus 25 years); Necole Lamb to a total of 138 months; Donald Lamb to a total of 147 months; and Ruby Lamb to a total of 295 months.

## II. Analysis

### A. § 924(c)(1) Convictions

Each defendant was convicted of violating 18 U.S.C. § 924(c)(1), which provides that

> Whoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years.... In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years....

The defendants all appeal their § 924(c)(1) convictions.

Helen Jackson, who was convicted of two violations of § 924(c)(1), contends that there was insufficient evidence to support those convictions. She argues that there was inadequate proof that she had used the Taurus revolver "during or in relation to" her crimes of conspiracy and possession. To succeed, Jackson must show that, viewing the evidence in the light most favorable to the government, no rational jury could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Baskin–Bey*, 45 F.3d 200, 204 (7th Cir.), *cert. denied*, ––– U.S. –––, –––, 115 S.Ct. 1809, 1986, 131 L.Ed.2d 734, 873 (1995); *United States v. Woods*, 995 F.2d 713, 717 (7th Cir. 1993). Jackson concedes that she possessed the Taurus revolver; therefore, the only question is whether she used it "during and in relation to" her crimes. *United States v. Taylor*, 31 F.3d 459, 464 (7th Cir.1994).

 It is true, as Jackson reminds us, that possession of a firearm unrelated to a concurrent drug trafficking offense is not by itself enough to trigger § 924(c)(1). *Taylor*, 31 F.3d at 465. However, it is equally true that the presence of a firearm in the vicinity of a seller's drug stash, even where no buying or selling takes place near the stash, may suffice to support a § 924(c)(1) conviction because the firearm serves to guard the defendant's stock of drugs. *United States v. Willoughby*, 27 F.3d 263, 265 (7th Cir.1994). If the surrounding circumstances show that the firearm facilitated the possession of drugs slated for distribution, a defendant may properly be convicted of violating § 924(c)(1). *Id.; United States v. Villagrana*, 5 F.3d 1048, 1052 (7th Cir.1993). Helen Jackson kept her gun loaded and within easy reach a few feet from where the drugs were stored. Furthermore, her .357 Magnum was a large-caliber handgun that she could use both to intimidate and to kill. We have found that similar circumstances support a § 924(c)(1) conviction. *See id.; Willoughby*, 27 F.3d at 265. Furthermore, on the government's tapes Helen Jackson told her sister Ruby Lamb that she had grabbed her gun when she thought she heard an intruder. A reasonable juror could have concluded that she reached for the gun not only to protect herself but to protect her drugs and thus

facilitate her drug trafficking activity. There was more than adequate evidence to support Helen Jackson's § 924(c)(1) convictions.

 Jackson also argues that she can be convicted only of one violation of § 924(c)(1), rather than two. She points out that both § 924(c)(1) convictions arose out of the same general course of activity, dealing cocaine. It may be that a defendant may not be convicted twice of violating § 924(c)(1) based on a single underlying drug trafficking offense. *See United States v. Henry*, 878 F.2d 937, 942 (6th Cir.1989). But the jury convicted Jackson of two separate drug trafficking offenses, conspiracy to distribute and possession with intent to distribute. Those are distinct crimes with different elements; each properly supports a separate § 924(c)(1) conviction, even though both § 924(c)(1) charges were contained in the same indictment. *Deal v. United States*, ––– U.S. –––, ––– –––, 113 S.Ct. 1993, 1997–98, 124 L.Ed.2d 44 (1993); *United States v. Harris*, 2 F.3d 1452, 1456 (7th Cir.), *cert. denied*, ––– U.S. –––, 114 S.Ct. 481, 126 L.Ed.2d 432 (1993); *United States v. Privette*, 947 F.2d 1259, 1262–63 (5th Cir.1991), *cert. denied*, 503 U.S. 912, 112 S.Ct. 1279, 117 L.Ed.2d 505 (1992). Both of Jackson's § 924(c)(1) convictions stand.

The other defendants, Ruby, Donald, and Necole Lamb, also contend that insufficient evidence existed to convict them of violating § 924(c)(1). From our review of the evidence supporting Jackson's convictions, it is clear that there was adequate evidence to support a conclusion that the Taurus revolver was used in furtherance of the conspiracy. The question therefore becomes whether it was not reasonably foreseeable to the other defendants that a firearm would be so used. *Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); *United States v. Williams*, 31 F.3d 522, 526 (7th Cir.1994).

 Ruby Lamb knew that Helen Jackson kept the drugs to be distributed by the conspiracy, and she knew (as shown by her taped conversation) that Jackson kept the Taurus close to her for easy access in case the need arose to defend the drug stash. We have no doubt that sufficient evidence existed

that Ruby Lamb could both reasonably foresee Jackson's use of the firearm and that she actually knew of its use.

As to Donald and Necole Lamb, no evidence suggests that either actually knew that Helen Jackson possessed a firearm. However, this Circuit has repeatedly held that "[b]ecause the drug industry is, by nature, a violent business, the presence of firearms in transactions involving sizeable quantities of drugs is reasonably foreseeable." *Williams,* 31 F.3d at 526 (one-time exchange of $120,000 for 150 pounds of marijuana); *see United States v. Edwards,* 36 F.3d 639, 644 (7th Cir.1994) (multiple transactions involving up to $5,000); *United States v. Gutierrez,* 978 F.2d 1463, 1468 (7th Cir.1992) (transaction of $60,000 for two kilograms of cocaine); *United States v. Diaz,* 864 F.2d 544, 549 (7th Cir.1988) (exchange of $39,000 for one kilogram of cocaine), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). The common thread running through our cases is that sizeable drug transactions support a finding of foreseeability, i.e., where the quantities involved were large enough to create a significant incentive for drug traffickers to want weapons to defend their stock.

The police found 127 grams of cocaine at Helen Jackson's house, packaged in smaller quantities for retail sale. The defendants' own price lists established that they sold cocaine for $1100 for a full ounce and $550 for a half ounce. At that price, the retail worth of the 127 grams of cocaine was nearly $5,000. Even though the conspirators did not intend to sell all that cocaine in one transaction, having that amount of cocaine stored in one place for later distribution created the usual incentive to provide armed protection. A conspirator's use of a firearm is foreseeable in those transactions where, as here, a firearm provides the participant "the security and confidence necessary to undertake" such drug distribution operations. *United States v. Ocampo,* 890 F.2d 1363, 1371 (7th Cir.1989). The value of the drugs kept at Helen Jackson's house was sufficient to support the jury's conclusion that Donald and Necole Lamb could reasonably foresee their co-conspirator's use of a firearm.

**B. Ineffective Assistance of Counsel**

The bulk of the government's case consisted simply of playing the tapes made pursuant to a court-ordered wiretap and identifying the voices recorded. Because the tapes were crucial to the government's case, trial counsel moved to suppress the tapes by attacking the validity of the intercept order issued to allow the wiretap. Trial counsel's theory was that FBI agent John McGauley made false allegations in his affidavit, and that without those allegations there would have been no probable cause to issue the intercept order. To expand that theory, trial counsel asked the court to hold an evidentiary hearing regarding McGauley's affidavit. Defendants now say that trial counsel acted incompetently in requesting that hearing.

The procedure for obtaining an intercept order follows the same pattern as that for a search warrant. *See United States v. Feekes,* 879 F.2d 1562, 1566 (7th Cir.1989); 18 U.S.C. § 2518. Affidavits supporting search warrants are presumed valid. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978); *United States v. McAllister,* 18 F.3d 1412, 1416 (7th Cir.1994). Therefore, a defendant is generally not entitled to a hearing regarding the evidence contained in an affidavit supporting a search warrant or intercept order. If, however, a defendant can make a "substantial preliminary showing" that an affiant included deliberately false material statements, or recklessly disregarded the truth, the Fourth Amendment requires that the district court hold an evidentiary hearing. *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676; *United States v. Causey,* 9 F.3d 1341, 1343 (7th Cir.1993). A defendant asking for such an evidentiary hearing makes a so-called *Franks* motion. To obtain a hearing, however, " 'the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine the affiant.' " *McAllister,* 18 F.3d at 1416 (quoting *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684).

Trial counsel here did make a *Franks* motion, pointing to five alleged untruths in McGauley's affidavit supporting the order. However, trial counsel did not claim to be

able to make a "substantial preliminary showing" that McGauley had deliberately or recklessly included untruths in his affidavit. Instead, trial counsel argued:

> The affidavit is replete with false and/or misleading information supplied by Agent McGauley. Whether the discrepancies are due to inadvertence, failure of recollection, intentional misstatement of fact, we cannot determine because we do not have information sufficient to determine the validity of the rest of the information.

That was the crux of trial counsel's argument. The court refused to grant an evidentiary hearing, stating:

> The Defendants take the position that since they have shown that some of McGauley's information was incorrect, they are entitled to a hearing so that they can cross-examine McGauley and obtain access to all of his investigative reports, in an attempt to show that McGauley's affidavit does not support probable cause. The Defendants have misread *Franks*. The affidavit in support of probable cause is presumed to be valid. This presumption is rebutted only by allegations of deliberate falsehoods or of reckless disregard for the truth, and these allegations must be accompanied by offers of proof. The Defendants have not met this standard and, consequently, the Court will not hold a *Franks* hearing.

To show constitutionally ineffective assistance of counsel, as the defendants allege, they must identify specific erroneous acts or omissions that, in the context of the entire trial, amounted to ineffective assistance, and they must show that deprivation prejudiced their defense. *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *United States v. Moutry*, 46 F.3d 598, 604–05 (7th Cir.1995). Defendants do not progress very far under the *Strickland* test, because they do not even manage to identify any actual errors.

■ Defendants argue that trial counsel erroneously prepared the denied *Franks* motion. They contend that trial counsel should have alleged that McGauley's misstatements were deliberately or recklessly made. However, effective assistance certainly does not mean counsel must claim to have information he actually lacks, simply hoping his client will benefit from his speculation. Trial counsel here did not make the "substantial preliminary showing" of McGauley's deliberate deception because he could not, not because he forgot to do so. Trial counsel had a hunch he sought to develop: he wanted to cross-examine McGauley in hopes of finding reason to cast doubt on his credibility. *Franks* forbids exactly that, as the district court pointed out. That meant that defendants were precluded from having an evidentiary hearing, not that counsel should have falsely claimed to have information he lacked in hopes of finagling a hearing.[1]

### C. Miscellaneous

■ Donald Lamb challenges the sufficiency of the evidence supporting his conspiracy conviction. He points out that agents did not search his house and argues that he simply used cocaine he bought from Ruby Lamb and Helen Jackson. However, the jury heard substantial direct and circumstantial evidence of Donald Lamb's participation in the conspiracy, including his frequent conversations about drugs with other co-conspirators and his multiple requests for significant quantities (up to half an ounce) of drugs within a short time, sometimes more than once a day. For example, Donald Lamb requested that Ruby Lamb deliver to him a half-ounce of cocaine shortly after he had already received a half-ounce shipment, and she asked him whether he had already been brought a half-ounce. Donald Lamb replied that he had "taken care of that already." His reply could be taken to mean he had used it himself, but a rational jury could also find that he had distributed it as part of his

---

1. We note, furthermore, that the argument that Agent McGauley deliberately deceived the court to obtain the warrant is unfounded. The errors defendants point to in the affidavit were minor (e.g., Ruby Lamb did indeed not have two convictions: she had one and was about to have another once a judicial proceeding in progress had finished). Probable cause would certainly have existed had the allegedly false statements been excised from the affidavit. There was no basis for accusing Agent McGauley of perjury.

ongoing agreement to distribute cocaine with the other conspirators, especially given his multiple demands for drug deliveries in a short period of time.

### III. Conclusion

The defendants raise other arguments; all of them lack merit and do not require further discussion. We AFFIRM the convictions and sentences of Helen Jackson, Necole Lamb, Donald Lamb, and Ruby Lamb.